**Ray WILDMAN, Plaintiff,**

v.

**MEDTRONIC, INC., Medtronic USA, Inc., Defendants.**

**No. 5:16–CV–663–DAE**

United States District Court, W.D. Texas, San Antonio Division.

Signed 12/22/2016

---

Jeff M. Meyerson, The Meyerson Law Firm, P.C., Austin, TX, for Plaintiff.

Gregory J. Casas, Elizabeth Ross Hadley, Greenberg Traurig LLP, Austin, TX, Ginger Pigott, Greenberg Traurig, LLP, Los Angeles, CA, Victoria Davis Lockard, Greenberg Traurig, LLP, Atlanta, GA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

DAVID ALAN EZRA, UNITED STATES DISTRICT JUDGE

Before the Court is a Motion for Judgment on the Pleadings filed by Medtronic, Inc. and Medtronic USA, Inc. (collectively, "Defendants" or "Medtronic") on October 14, 2016. (Dkt. # 18.) Ray Wildman ("Plaintiff" or "Wildman") filed a Response in opposition (Dkt. # 23), and Defendants filed a Reply (Dkt. # 25). Pursuant to Local Rule CV–7(h), the Court finds this matter suitable for disposition without a hearing.

After careful consideration of the memoranda filed in support of and in opposition to the motion, the Court—for the reasons that follow—**GRANTS** Defendants' Motion for Judgment on the Pleadings (Dkt. # 18).

### BACKGROUND

Wildman is an individual who suffers from chronic back and bilateral leg pain. ("Am. Compl.," Dkt. # 9, ¶ 6). He alleges that Medtronic "marketed, warranted, and sold the RestoreUltra spinal neurostimulator ... as a device that would help relieve pain without medications." (Id.) The RestoreUltra spinal neurostimulator ("the RestoreUltra" or "device") is a prescription-only Class III implanted medical device. (Dkt. # 18 at 2.) The RestoreUltra is a surgically placed device, "about the size of a stopwatch," which provides pain relief by blocking pain messages from the spinal cord before they reach the patient's brain. (Am. Compl. ¶ 7.) The device delivers mild electrical signals to the epidural space near the spine through thin wires that provide electrical impulses to plastic leads, the latter of which are placed by surgeons into the spinal canal. (Id.) The patient feels

tingling sensations instead of pain, and he can turn the device on or off—and sometimes, can change preset programs—to obtain the desired level of pain relief. (Dkt. # 18 at 4–5.)

On September 30, 2011, Wildman was implanted with a trial spinal cord stimulator. (Am. Compl. ¶ 6; "Ans.," Dkt. # 11, ¶ 6; Dkt. # 18 at 8–9.) On November 11, 2011, Wildman was implanted with a permanent RestoreUltra by Dr. Wilson Velasquez at Christus Spohn Hospital in Corpus Christi, Texas. (Am. Compl. ¶ 6; Ans. ¶ 6; Dkt. # 18 at 9.) Wildman alleges that the RestoreUltra that was implanted "had a reliable device life span of nine years" because of the "express warranty" stating as much on Medtronic's website. (Am. Compl. ¶¶ 8–9.) To support this allegation of the device's nine-year warranty, Wildman points to a screenshot of the following undated language from Medtronic's website (hereafter, "the Statement"):

**9–Year Device Life**

While other manufacturers may state that their batteries have a longevity greater than 9 years, it's important to understand that many other factors and components are involved in determining the overall longevity of an implanted medical device. The result of extensive design and testing involved in manufacturing rechargeable neurostimulators give Medtronic the confidence that our device is reliable for 9 years.

To achieve this distinction, Medtronic rigorously verified and validated the many components that impact device longevity, not just the battery. The result is a rechargeable neurostimulator that delivers reliable performance over the entire period of predicted service. Medtronic is the only company to offer a Neuromodulation Product Performance Report.

(Id. ¶ 8.) Wildman claims he relied on this nine-year express warranty in deciding whether to purchase the RestoreUltra and have it implanted. (Id. ¶ 9.) He also alleges that this warranty language in the Statement was "never reviewed by or submitted to the FDA for approval." (Id.)

A year-and-a-half after the RestoreUltra was implanted, Wildman alleges that the device began to "malfunction," and that Medtronic's representatives were notified and attended some of his medical appointments. (Id. ¶ 10.) On November 12, 2013, Wildman was referred to Dr. Maged Mina ("Dr. Mina") to consider replacing the RestoreUltra because the device had "quit working altogether." (Id.) Wildman alleges that, "[d]ue to the device's failure, Defendants recommended that the device be removed." (Am. Compl. ¶ 11.) According to Wildman, Dr. Mina's office records from February 17, 2015 indicate that "the entire device was dead." (Id.)

On March 19, 2015, Dr. Mina surgically extracted the RestoreUltra from Wildman's body. (Id. ¶ 12; Ans. ¶ 12.) Wildman alleges that the device-removal site became infected after the staples were removed, and that for seven to ten days afterwards, the wound site was "excessively draining liquid and [ ] very painful." (Am. Compl. ¶ 12.) As a result of the infection, on April 8, 2015, Wildman went to Northeast Methodist Hospital in Live Oak, Texas, where doctors found an abscess had formed. (Id. ¶ 13.) He was transferred to St. Luke's Baptist Hospital on April 10, 2015 for surgery consultation, and on April 16, 2015, the abscess was drained by Dr. Jean–Louis Caron. (Id.) Wildman was discharged on April 20, 2015, and he maintains that—because of the "multiple surgeries caused by the defective device"—he could not work from March 2015 until July 2015. (Id.)

Wildman initiated the present suit against Medtronic in state court, but Medtronic properly removed to this Court on

July 1, 2016. (Dkt. # 1.) On August 2, 2016, Wildman filed an amended complaint. (Am. Compl.) Wildman asserts a sole cause of action for breach of express warranty. (Id. at 4–5.) He maintains that, because Medtronic had marketed the RestoreUltra "would work reliably for nine years," Medtronic breached the express nine-year warranty of its product's "device life" since the RestoreUltra stopped working within two years of being implanted. (Id. ¶¶ 15–17.) Wildman also alleges that the warranty was not reviewed or approved by the FDA. (Id. ¶ 15.) Plaintiff seeks (1) actual and consequential damages for, *inter alia*, pain and mental anguish, medical treatment incurred, and lost wages, (2) pre- and post-judgment interest, and (3) attorneys' fees. (Id. ¶ 22.)

On August 15, 2015, Medtronic filed its answer and affirmative defenses. (Ans.) On October 14, 2016, Medtronic filed the instant Motion for Judgment on the Pleadings with attached exhibits. (Dkt. # 18). Wildman filed his Response on October 28, 2016 (Dkt. # 23), and Medtronic filed its Reply on November 4, 2016 (Dkt. # 25).

## LEGAL STANDARD

### I. Motion for Judgment on the Pleadings under Rule 12(c)

After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). A Rule 12(c) motion is "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." Hebert Abstract Co., Inc. v. Touchstone Props., Ltd., 914 F.2d 74, 76 (5th Cir. 1990) (internal citations omitted). Thus, a Rule 12(c) motion should be granted if there is no issue of material fact, and if the pleadings show that the moving party is entitled to judgment as a matter of law. Greenberg v. Gen. Mills Fun Grp., Inc., 478 F.2d 254, 256 (5th Cir. 1973).

The standard for deciding a Rule 12(c) motion is the same as for a Rule 12(b)(6) motion to dismiss for failure to state a claim. In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007). Thus, "[t]he central issue is whether ... the complaint states a valid claim for relief." Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir. 2002) (citations omitted). "The district court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Id. (internal citations and quotations omitted).

In analyzing the complaint, the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. Id. at 312–13. "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citations and quotations omitted). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

## DISCUSSION

Medtronic moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) based on three main arguments. (Dkt. # 18.) First, Medtronic main-

tains that Wildman's breach of express warranty claim for a Class III medical device approved by the Food and Drug Administration ("FDA") is expressly preempted by federal law. (Id. at 2, 10.) Second, Medtronic argues that Wildman has failed to adequately plead reliance on the purported warranty, which is an essential element of a breach of express warranty claim under applicable Texas law. (Id. at 4, 19.) Third, Medtronic argues that, even if Wildman has met the plausibility pleading standard for his claim, Medtronic's Limited Warranty is the exclusive remedy available to Wildman and should be enforced. (Id. at 8, 20.) Because the preemption argument is sufficient to decide the instant motion, the Court declines to address Medtronic's two remaining arguments.

## I. Federal Preemption

Medtronic argues that judgment on the pleadings is proper because Wildman's breach of express warranty claim is preempted by federal law. The RestoreUltra is a Class III medical device that is required to go through the FDA's Pre-Market Approval ("PMA") process pursuant to the Medical Device Amendments ("MDA," 21 U.S.C. § 360c, et seq.) to the Federal Food, Drug, and Cosmetic Act ("FDCA," 21 U.S.C. § 301, et seq.). (Dkt. # 18 at 2, 5–6.) The MDA contains an express preemption clause that applies only to medical devices under the FDCA ("Section 360k"). 21 U.S.C. § 360k. Section 360k expressly preempts state law claims that would impose requirements "different from, or in addition to" and "relating to the safety or effectiveness of" requirements imposed by the FDA on medical devices using the PMA process mandated by the MDA. Id.; see also Dkt. # 18 at 3, 10.

.Thus, Medtronic argues that Wildman's claim is preempted under the MDA for two reasons. First, a finding of breach of warranty "would require a determination that the medical device at issue should have been labeled, designed, manufactured, or programmed in a manner *different* from that approved by the FDA." (Dkt. # 18 at 2) (emphasis added). Second, it is an express warranty claim that "implicates the safety or effectiveness of a device that has received premarket approval," directly contravening Section 360k. (Id. at 15–16.) In response, Wildman contends there is no preemption problem because a breach of express warranty claim does not implicate the FDA's determinations of safety or effectiveness made during the PMA process. (Dkt. # 23 at 4.) Furthermore, he maintains that the warranty was made voluntarily by Medtronic, and thus was never required or approved by the FDA in the first place. (Id. at 4–5.)

To assess whether the MDA expressly preempts Wildman's breach of express warranty claim as to the RestoreUltra, the Court analyzes, in turn: (1) the FDA's statutorily-mandated PMA process for the RestoreUltra, including whether the language in the Statement would be and was reviewed during this process to constitute imposition by Medtronic as a "federal requirement"; and then (2) the MDA's express preemption clause and whether Wildman's breach of express warranty claim creates "different or additional" requirements relating to the "safety or effectiveness" of the RestoreUltra. See Riegel v. Medtronic, Inc., 552 U.S. 312, 321–22, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008) (laying out this two-step analysis when reviewing a claim of express preemption under the MDA's Section 360k); see, e.g., Chiasson v. Medtronic, Inc., Civil Action Nos. 16–789, 2016 WL 4191837, at *3 (E.D. La. Aug. 9, 2016) (applying Riegel's two-part test to a preemption claim under the MDA).

If the Court finds in the affirmative at both steps, Wildman's claim is preempted, and judgment on the pleadings in favor of Medtronic is proper because the pleadings would show that Medtronic, the moving party, is entitled to judgment as a matter of law under the MDA. See Greenberg, 478 F.2d at 256; see also Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012) ("Unless the complaint itself establishes the applicability of a federal-preemption defense—in which case the issue may properly be the subject of a Rule 12(b)(6) motion—a defendant should ordinarily raise preemption in a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment" (internal citations omitted)). Importantly, the Court must first analyze whether the FDA would and did review and approve the purported warranty language because a finding that the Statement was not required by the FDA would dispose of Medtronic's preemption argument, since the MDA expressly preempts state law variations from federally-imposed FDA requirements. See 21 U.S.C. § 360k.

## A. "Federal Requirements" Imposed by the FDA's Pre–Market Approval Process for the RestoreUltra, as Construed Under Section 360k

Congress passed the MDA in 1976 to establish a regulatory regime to approve and monitor the development, manufacture, and sale of medical devices. Chiasson, 2016 WL 4191837, at *3. The MDA establishes three classes of medical devices and the corresponding required standards of federal oversight. Riegel, 552 U.S. at 316, 128 S.Ct. 999; see also Dkt. # 18 at 5. Class III devices require the "most federal oversight" because, by definition, the devices in this category support or sustain human life, substantially prevent impairment of human health, or present a potentially unreasonable risk of injury or illness. Riegel, 552 U.S. at 317, 128 S.Ct. 999

(citing 21 U.S.C. § 360c(a)(1)(C)(ii) & (iii)). The RestoreUltra is a Class III medical device, and thus is subject to the "rigorous" and extensive pre-market approval ("PMA") process outlined by the MDA. (Dkt. # 18 at 2, 5–6.) "The Supreme Court has twice addressed the preemption of state law claims regarding medical device liability pursuant to 360k," and as such, has outlined the PMA process required by the MDA. Hughes v. Bos. Sci. Corp., 631 F.3d 762, 767 (5th Cir. 2011) (citing Riegel, 552 U.S. 312, 128 S.Ct. 999 (2008) and Medtronic v. Lohr, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)).

A manufacturer of a Class III device must submit "what is typically a multivolume application" to the FDA, which includes, inter alia, reports of studies and investigations of the device's safety and effectiveness; a statement of the device's "components, ingredients, and properties and of the principle(s) of operation"; samples or device components; and a "specimen of the proposed labeling." Riegel, 552 U.S. at 317–18, 128 S.Ct. 999 (citing 21 U.S.C. § 360e(c)(1)); see also Dkt. # 18 at 5–6. Most pertinent to the present case, "[t]he premarket approval process includes review of the device's proposed labeling . . . and [the FDA] must determine that the proposed labeling is neither false nor misleading." Riegel, 552 U.S. at 318, 128 S.Ct. 999 (citing 21 U.S.C. § 360e(d)(1)(A)). The FDA spends an average of 1,200 hours reviewing each PMA application, Lohr, 518 U.S. at 477, 116 S.Ct. 2240, and grants approval "only if it finds there is 'reasonable assurance' of the device's 'safety and effectiveness.' " Riegel, 552 U.S. at 318, 128 S.Ct. 999 (quoting 21 U.S.C. § 360e(d)). Notably, once a Class III device has been FDA–approved through the PMA process, the MDA "forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling,

or any other attribute, that would affect safety or effectiveness." Id. at 319, 128 S.Ct. 999 (citing 21 U.S.C. § 360e(d)(6)(A)).

The Supreme Court has held and subsequently re-emphasized that, as construed under the MDA's Section 360k, the PMA process for Class III devices imposes "federal requirements" relating to safety and effectiveness "because the FDA requires a device that has received premarket approval to be made with almost no design, manufacturing, or labeling deviations from the specifications in its approved application." Altria Grp., Inc. v. Good, 555 U.S. 70, 87, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (discussing its holding in Riegel). Therefore, at this first step of the Riegel analysis, the inquiry for this Court is whether the substantive content of the Statement—claimed to be an "express warranty" by Wildman—was in fact reviewed and approved during the RestoreUltra's PMA process, such that it should be construed as a federal requirement under Section 360k. See Riegel, 552 U.S. at 321–23, 128 S.Ct. 999.

At the outset, Wildman tries to persuade the Court that it "must construe preemption provisions in light of the presumption *against* preemption of state police power" (Dkt. # 23 at 3) (emphasis added), but as Medtronic correctly points out (Dkt. # 25 at 4 n.3), the Supreme Court has squarely stated the opposite when the text of a statute plainly contains a preemption clause. See Cuomo v. Clearing House Ass'n, L.L.C., 557 U.S. 519, 554, 129 S.Ct. 2710, 174 L.Ed.2d 464 (2009) ("There should be no presumption against preemption because Congress has expressly preempted state law in this case") (citing Altria Grp., 555 U.S. at 98, 129 S.Ct. 538, THOMAS, J., dissenting (presumption against preemption "dissolves" once there is evidence of intent to preempt in the statute)).

More to the point, Wildman attempts to get around the first step of the Riegel analysis by arguing that the Statement was "voluntarily made" by Medtronic. (Dkt. # 23 at 1, 2, 4.) Wildman raises bare assertions that the "FDA never even reviewed, let alone approved" the Statement. (See, e.g., id. at 4.)[1] Presumably if that were true, the Statement would not be considered a federally-imposed device-specific requirement subject to preemption protection under Section 360k.

The Court first points out that there is no dispute that the RestoreUltra as a Class III medical device *has* received approval through the PMA process, facially satisfying the first step of the Riegel test. See Riegel, 552 U.S. at 322–23, 128 S.Ct. 999 (premarket approval is specific to individual devices and imposes federal "requirements" under Section 360k of the MDA). The predecessor model of the RestoreUltra first received approval through

---

1. In support of this contention, Wildman points to the January 2008 PMA Approval letter for the RestoreUltra that Medtronic attached to its motion, which states, in part, that: "[the FDA] does not does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws." (Dkt. # 23 at 7; see also Dkt. # 18–4, Ex. D, at 3.) First, this statement does not, contrary to Wildman's assertion, necessarily demonstrate that the FDA did *not* review the substance of the Statement, which is that the underlying battery life of the RestoreUltra is nine years. The "9 year[ ]" battery life was, in fact, reviewed as part of the Implant Manual during the PMA process. (See Dkt. # 18–6, Ex. F, at 10.) Moreover, even assuming the Statement (a) qualifies as a contract warranty (as opposed to labeling), and (b) was not reviewed by the FDA, nothing in the Statement is "misleading" or is not "truthful and accurate."

the PMA process in 1984 under PMA Number P840001. (Dkt. # 18 at 7; Dkt. # 18–2, Ex. B.) The RestoreUltra model at issue in this case received approval through PMA Supplement 97 on January 8, 2008. (Dkt. # 18 at 7; Dkt. # 18–3, Ex. C; Dkt. # 18–4, Ex. D.) As Medtronic notes correctly, "[i]n granting premarket approval … the FDA reviewed and approved the labeling that would accompany the device." (Dkt. # 18 at 7 (citing 21 U.S.C. § 360e(c)(1)(F).) Thus, premarket approval necessarily implies that the FDA has deemed the device's labeling neither false nor misleading. See 21 U.S.C. § 360e(d)(1)(A) ("In making the determination whether to approve or deny the application, [the FDA] shall rely on the conditions of use included in the proposed labeling as the basis for determining whether or not there is reasonable assurance of safety and effectiveness, if the proposed labeling is neither false nor misleading").

However, the issue here is that the parties dispute *what exactly* was approved as part of the RestoreUltra's "labeling" during the PMA process, which requires the Court to scrutinize the basis for Wildman's breach of express warranty claim. Wildman's amended complaint bases his breach of express warranty claim on an undated screenshot of language from Medtronic's website, entitled "9–Year Device Life." (Am. Compl. ¶ 8.) It reads, in pertinent part:

> The result of extensive design and testing involved in manufacturing rechargeable neurostimulators give Medtronic the confidence that our device is reliable for 9 years. To achieve this distinction, Medtronic rigorously verified and validated the many components that impact device longevity, not just the battery.

(Id.) Wildman alleges that the Statement "warranted that the stimulator components would work reliably for nine years," and that because the device "failed working within two years of it being implanted," Medtronic breached the RestoreUltra's "express warranty." (Id. ¶¶ 10, 16, 17.) Further, Wildman argues that the Statement "guarantees reliable performance of all the stimulator components, not just the battery." (Dkt. # 23 at 6.)

Medtronic argues that Wildman's breach of express warranty claim is "ultimately predicated" on the statement that the device's "[b]attery life" is "9 years," which was approved by the FDA in the Implant Manual listing the RestoreUltra's "physical characteristics." (Dkt. # 18 at 12–13; Dkt. # 18–6, Ex. F at 10.) Medtronic argues that it could not have stated that the device life was anything other than nine years because, since the FDA approved the Implant Manual as part of the RestoreUltra's labeling during the PMA process, the RestoreUltra could not be manufactured or marketed with any deviations from what was specifically FDA–approved. (Dkt. # 18 at 12–13.) Further, Medtronic implores the Court to take judicial notice of the fact that Wildman's original complaint placed an explicit emphasis on "battery life," whereas his amended complaint uses more general phrasing regarding a warranty of the "device life," presumably to get around the preemption bar since the FDA reviewed and approved the specific statement that the RestoreUltra has a "[b]attery life" of "9 years." (Id. at 3 n.1; Dkt. # 25 at 2–3.)

For purposes of Riegel preemption analysis, the Court finds that the FDA reviewed and approved the substance of the Statement language at issue, underlying which is that the RestoreUltra's battery life is nine (9) years. In reaching this conclusion, the Court takes guidance from Bass v. Stryker Corp., 669 F.3d 501 (5th Cir. 2012). There, the Fifth Circuit affirmed a trial court's dismissal of a plain-

tiff's marketing defect claim because the plaintiff had not plead sufficient facts as to how the marketing of the device at issue had violated FDA regulations. Id. at 515. Though Wildman brings a breach of express warranty claim, the logic is similarly applicable. The FDA's approval of the RestoreUltra through the federally-mandated PMA process was premised on the device being marketed and distributed with no deviations as to what was reviewed by the FDA, thus imposing "federal requirements" on the RestoreUltra. Here, the RestoreUltra received premarket approval, in part, on the basis of materials stating that the battery life was nine years. (See Dkt. # 18–6, Ex. F at 10.) This is, in effect, what the Statement conveys. Medtronic has not violated FDA regulations, and therefore the MDA, in describing or representing the RestoreUltra's device life as being nine years.

██ This finding is consistent with the fact that Wildman's claim is ultimately premised on the basis that the implanted RestoreUltra did not function for the entirety of the stated "9 years" (see Am. Compl. ¶¶ 10, 16), not that Medtronic violated the MDA by stating the device would last for a period of time *other than* nine years. It is precisely for this reason that Wildman's parallel claim argument fails, too. Wildman's reply in opposition to Medtronic's motion argues that he has successfully pled a "parallel claim." (Dkt. # 23 at 7.) "A cognizable parallel claim must primarily assert [ ] state law claims that are parallel to (i.e., not expressly preempted by) the FDA regulations." Chiasson, 2016 WL 4191837, at *4. If a plaintiff pleads in a state law claim "that a manufacturer of a Class III medical device failed to comply with [ ] the specific processes and procedures that were approved by the FDA ... and that this failure caused the injury, the plaintiff will have pleaded a parallel claim." Bass, 669 F.3d at 512–13.

Again, Wildman here does not allege that Medtronic deviated from, or failed altogether to abide by, the specifications outlined in the materials reviewed and approved by the FDA during the RestoreUltra's PMA process. With respect to parallel claims, though the Supreme Court has made clear that a manufacturer is not protected from tort liability "when the claim is based on the manufacturer's *violation* of applicable federal requirements," Hughes, 631 F.3d at 767 (citing Riegel and Lohr) (emphasis added), a PMA–approved device's operation is not guaranteed—even when manufactured pursuant to all federal regulations—and thus its alleged malfunction is not a "violation." See, e.g., Walker v. Medtronic, Inc., 670 F.3d 569, 580 (4th Cir. 2012) ("in granting premarket approval, the FDA ... recognize[s] that the device's safety and reliability cannot be guaranteed indefinitely in the 'extremely hostile environment of the human body,' where myriad other factors external to the device are brought to bear"); see also Dkt. # 25 at 5. In large part, this is because the FDA's premarket approval is statutorily based on "*reasonable assurance*" of the device's "safety and effectiveness." See 21 U.S.C. § 360e(d)(1)(A) (emphasis added). And in fact, post–Riegel, a "consensus of federal courts" have supported the conclusion that state law tort claims "based on the failure of devices that were designed, manufactured, and sold in accordance with the terms of their premarket approval were preempted under Riegel." Walker, 670 F.3d at 580–81 (citing cases).

Accordingly, under the first step in Riegel, the Court finds that it was a "federal requirement" as construed under Section 360k for Medtronic to describe and label the RestoreUltra as having a device life of nine years. Contrary to Wildman's assertion, this is not a "voluntary" statement by Medtronic that would otherwise allow him

to run around the MDA's preemption clause. Having found—under Section 360k—a "federal requirement" imposed by the FDA on Medtronic for the RestoreUltra, the Court moves to the second step of Riegel: whether Wildman's breach of express warranty claim creates "different or additional" requirements such that his claim is expressly preempted.

## B. "Different or Additional" Requirements Imposed by Wildman's Breach of Express Warranty Claim, as Construed Under Section 360k

■ Section 360k of the MDA expressly preempts state law requirements that create requirements "different from, or in addition to" and "relat[ing] to the safety or effectiveness" of devices approved by the FDA. 21 U.S.C. § 360k(a). The Supreme Court has held that Section 360k's reference to "state requirements" includes common law duties. Mut. Pharm. Co., Inc. v. Bartlett, 565 U.S. 625, 133 S.Ct. 2466, 2474 n.1, 186 L.Ed.2d 607 (2013) (citing Riegel, 552 U.S. at 324, 128 S.Ct. 999 (citing Lohr, 518 U.S. 470, 116 S.Ct. 2240; Cipollone v. Liggett Grp., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992))). Therefore, the Supreme Court has generally rejected petitioners' arguments that state common law claims, as opposed to state legislation or regulation, are not covered by federal preemption clauses. See, e.g., Kurns v. R.R. Friction Prods. Corp., 565 U.S. 625, 132 S.Ct. 1261, 1269–70, —— L.Ed.2d —— (2012) (citing Riegel, 552 U.S. at 324, 128 S.Ct. 999 ("Absent other indication, reference to a State's 'requirements' [in a federal express preemption provision] includes its common law duties")).

Here, Wildman asserts a breach of express warranty claim against Medtronic's federally-approved RestoreUltra. Under Riegel's second step, the question then is whether this claim creates requirements "different from, or in addition to" the federal requirements imposed by the PMA process on Medtronic's manufacture, distribution, and marketing of the RestoreUltra. See, e.g., Hinkel v. St. Jude Med., S.C., 869 F.Supp.2d 739, 746 (E.D. La. 2012) ("The Court must ... determine whether any of these theories [including "failure to comply with an express warranty"] seek to impose requirements 'different from, or in addition to' the applicable federal standards"). In light of this Court's sister courts' similar decisions on the issue post–Riegel, as well as the Fifth Circuit's decision in Gomez v. St. Jude Med. Diag. Div., Inc., 442 F.3d 919, 932 (5th Cir. 2006), the Court finds that it does.

As recently as April 2016, for example, the Southern District of Texas dismissed plaintiffs' express and implied warranty claims against a Class III medical device that had received premarket approval because it found that "a jury would still have to find that the [device] was unsafe and ineffective in order to find that [the defendant manufacturer] breached these warranties." Yosowitz v. Covidien, LP, 182 F.Supp.3d 683, 696 (S.D. Tex. 2016) (internal quotations and citations omitted). Such a finding would be contrary to the FDA's express determination otherwise through the PMA process, so the court found that "the state claim is based on different or additional requirements and is expressly preempted by the MDA." Id. Likewise, the Eastern District of Louisiana found a plaintiff's state law breach of express warranty claim was preempted under the MDA because, citing the Fifth Circuit's reasoning and decision in Gomez: " 'A jury hearing [the plaintiff's] state-law breach of express warranty claim would have to decide whether [the defendant's] representations about the [medical device] were true. Because those representations—including the label, warnings ... were approved by the FDA through the PMA process, the duties arising under the Louisiana breach

of warranty statute relate to, and are potentially inconsistent with, the federal regulatory scheme. The claim is preempted.'" Gavin v. Medtronic, Inc., Civil Action No. 12–0851, 2013 WL 3791612, at *15–16 (E.D. La. July 19, 2013) (quoting Gomez, 442 F.3d at 932).

For the reasons outlined above, as well as the Fifth Circuit's Gomez decision affirming the same—albeit in the context of express warranty claims under Louisiana state law—the Court finds that Wildman's breach of express warranty claim under Texas law would necessarily impose requirements "different from, or in addition to" the federally-imposed requirements on the RestoreUltra. Because Wildman's claim is premised on the fact that his device did not work for the nine years stated to be the device life (see Am. Compl. ¶¶ 10, 16), allowing Wildman's breach of express warranty claim to proceed would directly contravene the FDA's determination that the device was both "safe and effective" as reviewed through the PMA process. See 21 U.S.C. § 360e(d)(1)(A). And since the Fifth Circuit has noted that, to establish a defective device based on breach of an express warranty a plaintiff would have to prove representations regarding the device were untrue, these are findings that would essentially displace the FDA's expertise on the RestoreUltra and create inconsistent regulatory regimes between the MDA and Texas law. See Hinkel, 869 F.Supp.2d at 747–48 (citing and discussing Gomez, 442 F.3d at 932). Wildman's breach of express warranty claim essentially seeks to impose liability on Medtronic notwithstanding Medtronic's actual compliance with the design, manufacturing, and labeling requirements approved by the FDA for the RestoreUltra.

In Godfrey v. Advanced Neuromodulation Sys., Inc., the Western District of Louisiana was faced with an almost identical scenario to the one here, where the plaintiff alleged a Class III medical device that had premarket approval did not conform to an express warranty because the "batteries failed to last seven to ten years." No. 2:10cv67, 2011 WL 7768092, at *3, *7–8 (W.D. La. Apr. 4, 2011). The court in Godfrey, citing the Fifth Circuit's Gomez decision, held that the claim was preempted by Section 360k. Id.; see also Timberlake v. Synthes Spine, Inc., Civil Action No. V–08–4, 2011 WL 711075, at *7 (S.D. Tex. Feb. 18, 2011) (finding, similarly, that plaintiff's express warranty claim was preempted because, "[e]ven assuming the statements [plaintiff] read on the Internet were made by Defendants and constituted express warranties under Texas law, a jury would still have to decide that the [device] was unsafe and ineffective when granting Defendant's PMA application") (emphasis added). Accordingly, the Court finds that Wildman's breach of express warranty claim would create "different or additional" state requirements to the federal requirements already imposed on the RestoreUltra, in contravention of Section 360k.

In so finding, the Court notes that Wildman's reliance on Schouest v. Medtronic, Inc., 13 F.Supp.3d 692 (S.D. Tex. 2014), is misplaced. (See Dkt. # 23 at 3–4). In an attempt to support his position that his breach of express warranty claim is not preempted, Wildman mischaracterizes the findings of Schouest when he states that the court noted an "'express warranty claim can survive to the extent [Plaintiff] seeks to recover based on false warranties that Medtronic voluntarily and falsely made beyond the federally approved warning.'" (See id., quoting Schouest, 13 F.Supp.3d at 707.) While this is an accurate quote from the decision, the court in Schouest went on to state that, "[w]hile conceptually an express warranty claim could avoid express preemption, what is

missing from [Plaintiff's] complaint, in its current form, is a description of what specific warranties Medtronic made to [Plaintiff] or her physicians." Schouest, 13 F.Supp.3d at 707. Notably, the court cited to district courts outside of the Fifth Circuit to support this position, and did not at all cite to the Fifth Circuit's Gomez decision, the most applicable and binding case for this issue in this jurisdiction.

Additionally, Schouest is inapposite because it relates to a breach of express warranty claim brought against a Class III medical device on the basis of its "off-label" use—"that is, in a way not expressly approved by the FDA." Id. at 696. The court there addressed the plaintiff's claims in light of her underlying theories that Medtronic either failed to warn against off-label uses or affirmatively misrepresented off-label procedures with the device were safe. Id. at 698, 703–04. Besides being substantively different than Wildman's underlying theory—that the RestoreUltra failed to work for the amount of time approved by the FDA and represented as much by Medtronic—the Schouest court also actually preserved ruling on whether the plaintiff's breach of express warranty claim survived the motion to dismiss until she could replead. Id. at 707. Therefore, the Schouest court's decision, besides merely being persuasive, is not conclusive one way or another as to whether Wildman's breach of express warranty claim is not, or should not be, expressly preempted under Section 360k.[2]

Accordingly, the Court finds that Wildman's sole breach of express warranty claim against Medtronic's RestoreUltra is expressly preempted under Section 360k of the MDA. Therefore, because Wildman's complaint shows that federal law preempts his claim, judgment on the pleadings is proper, see Fisher, 667 F.3d at 609, and Medtronic is entitled to judgment as a matter of law under the MDA. See Greenberg, 478 F.2d at 256; see also Great Plains Tr. Co., 313 F.3d at 312 (dismissal of a claim is proper when it is clear that the plaintiff cannot prove any set of facts to support the claim that would entitled him to relief).

## CONCLUSION

For the reasons set forth, the Court **GRANTS** Defendants' Motion for Judgment on the Pleadings (Dkt. # 18). Plaintiff's sole breach of express warranty claim is **DISMISSED WITH PREJUDICE.** The hearing scheduled for February 6, 2017 is **CANCELLED.**

**IT IS SO ORDERED.**

---

2. For many of the same reasons, the Court is even less persuaded by Wildman's reliance on Cline v. Advanced Neuromodulation Sys., Inc., 914 F.Supp.2d 1290 (N.D. Ga. 2012). Though perhaps factually more on point because the underlying case there was about a one-year warranty for an FDA–approved device's "craftsmanship ... apart from any FDA standards" (Cline, 914 F.Supp.2d at 1298), this Court—in light of Supreme Court and Fifth Circuit cases deciding preemption issues under the MDA—neither agrees with Cline's finding that an express warranty is not preempted because it is imposed by the warrantor (as opposed to state law), nor is required to agree, as the Northern District of Georgia is not binding authority on the Western District of Texas. (See also supra Discussion I.A.)